U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

DEC 2 0 2010

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF ARKANSAS

### HARRISON DIVISION

DAVID STEBBINS                                                    **PLAINTIFF**

*10-3123*

vs.

WAL-MART STORES, INC.        *Amended Complaint* **DEFENDANTS**

## MOTION TO CONFIRM ARBITRATION AWARD

Now comes Plaintiff David Stebbins, who respectfully moves for the court to confirm the following arbitration award.

Before I begin, allow me to warn you:  I can perceive a number of problems that you might have with this case, at first glance, but please continue to read on, and you will soon find out that my case is not as frivolous as you think.

On Tuesday, November 8, 2010, at approximately 8:36PM, I sent an email to the defendants. This email was a formal offer for a contract, which stated, among other things, the following:

1. The contract is entered into if they initiate communications with me, for any reason.  There were other actions they could perform to accept this contract, but this is the action they *did* perform.  Therefore, whether or not I could have bound them if they performed any of the other actions, is a moot point.  **Again, please read the enclosed brief, before you make any rash decisions.**

2. We must refer all legal disputes, not just those related to this contract, to arbitration, using the services of www.net-arb.com, an online arbitration firm that gives arbitration hearings for as low as $299.  This is the mutual consideration needed to form a contract – we *both* save time and money in any legal disputes between us, using arbitration.  This applies to both of us, and, therefore, there is sufficient consideration.  In fact, the consideration provided in arbitration is so blatant that it often stands alone as its own contract (when we arbitrate cases on a case-by-

case basis, the arbitration agreement stands alone as its own contract, yet is still perfectly valid).

3.  If they do not accept the arbitration invitation with 24 hours of receiving it, I automatically win, regardless of the merits of the case. **Again, Your Honor, please hear this motion out, in its entirety, before ruling on it.**

On the date of Wednesday, November 17, 2010, Wal-Mart sent me an email stating that my case had been moved to the regional headquarters, and I was invited to call them to settle the issue.

I sent an email to Wal-Mart *again*, on the date of Sunday, November 21, 2010, reiterating that I have sent them a contract with them, and that initiating communications with me, in any way, would cause them to accept. More details will be provided in the brief.

On the date of Wednesday, November 24, 2010, Wal-Mart emailed me *again*, stating, once again, that the case has been turned over to the regional office, and I was invited to call the regional headquarters to settle the matter.

For reasons that will be explained in the brief, this causes them to be bound. When they responded, a second time, they ran out of excuses. Details will be provided in the brief.

Later that day, on Wednesday, November 24, 2010, I filed a case against Wal-Mart, using www.net-ARB.com as the arbitration firm, per the arbitration agreement. According to the contract, they had until November 27, 2010 to accept the arbitration invitation, or else I win, automatically. The contract gave a time limit of 24 hours after they receive it, but it typically takes the Wal-Mart support team 48 hours to sift through all the emails, and finally get around to reading mine.

Rather than accept the invitation to arbitrate within the specified time limit, they did not accept it at all! Net-ARB, themselves, arbitrarily (no pun intended) closed the case on December 6, 2010, which was four times the time limit.

Let me put it this way: In litigation, parties typically have 30 days to respond to a request for admissions, otherwise all the facts that they failed to respond to were admitted. The court might go easy on them if they were a few days late, but if they take four months to respond, that's it; game over.

Likewise, Wal-Mart took four times the allotted time limit, and still did not accept the invitation to arbitrate.

I now wish to invoke the forfeit victory clause. For reasons explained in the brief, I do not feel that the forfeit victory clause was unconscionable, because it is, essentially, nothing more or less than the arbitration equivalent of a default judgment. In any event, the validity of the forfeit victory clause is something that the arbitrator must decide.

I wish to point out that there is **no** error in my calculation of an arbitration award. I have not put on too many zeroes onto the arbitration award I sought. I put that in there due to a penal damages clause in the contract (normally, a court would not enforce a penal damages clause, but that is something that the arbitrator must decide).

Wherefore, I respectfully pray that you promise to confirm the arbitration award that I sought, on the date of November 24, 2010.

Also, as you can see, I am applying for leave to proceed in forma pauperis. If this motion is granted, please have the Marshal execute the Service of Summons.

Sincerely,

David Stebbins

# IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF ARKANSAS

### HARRISON DIVISION

**DAVID STEBBINS**                                                    **PLAINTIFF**

**vs.**

**WAL-MART STORES, INC.**                                          **DEFENDANTS**

## BRIEF IN SUPPORT OF MOTION

Comes now Plaintiff David Stebbins, who submits the following brief in support of the enclosed motion to confirm an arbitration award.

First, I would like to cover the Facts. Then, I will move onto the law.

### Facts

I contend the following facts:

On November 9, 2010, I sent Wal-Mart a formal offer for a contract. For this, I have no exhibit that I can mail in, because it is on video. Instead, I will give you a direct link, on the Internet, where you can see the footage of me sending this contract offer.

Here is exhibit A:

http://s270.photobucket.com/albums/jj93/dstebbin/?action=view&current=WalMartofHarrisonArkansas.mp4

The contract I sent them in Exhibit A states, among other things, the following:

1. Contacting me in any way constitutes their acceptance.

2. We agree to settle all legal disputes, not just those related to thi

    binding arbitration, where they are bound, but I am not, using t

    arb.com.

    *Exh B-A*

3. If they do not accept my offer to arbitrate within 24 hours [after

    automatically win the amount requested, regardless of the merits of the case.

See Exhibit B for the text of that contract. Notice, I have censored a good deal of the contract, because most of the terms are irrelevant to this case.

On the date of November 17, 2010, I received an email from Wal-Mart, which stated nothing but an invitation to call their regional office. See Exhibit C.

On the date of November 21, 2010, I sent Wal-Mart another email, reiterating what I was doing, and implying how they may escape being bound by the contract. See Exhibit D.

On the date of November 24, 2010, I received another email, from Wal-Mart, with the same reference number. This email contained the exact same text in its body as the email shown in Exhibit C. See Exhibit E for this.

I sent Wal-Mart an invitation to arbitrate a dispute for $660,000,000,000 (no, that is **not** a typo), on the date of November 24, 2010. See Exhibit F.

As of at least December 4, 2010, Wal-Mart had not accepted the invitation to arbitrate. See Exhibit G.

Therefore, provided that my statements of law are also true, I am entitled to have this arbitration award confirmed, per the forfeit victory clause in my contract with Wal-Mart.

## Law

First, allow me to cover the basics. There are seven elements that a contract must possess in order to be valid and enforceable in a court. These elements are:

1. Offer

2. Acceptance

3. Consideration

4. Intent to be legally bound

5. Capacity (meaning, both parties must be capable of contracting)

6. Meeting of the minds

7. Legal (e.g. hitman contracts are not enforceable)

I assume that offer and capacity are not in dispute. Therefore, I will not comment on them beyond this two-sentence paragraph.

I will now move onto the second element of a contract: Acceptance.

**Wal-Mart accepted the contract on November 24, 2010.**

As stated in the motion, Wal-Mart contacted me to discuss a matter that may or may not be directly related to the contract. The contract explicitly stated that they agree to the terms, in the event that they initiate communications with me.

At first glance, this seems unconscionable. Wal-Mart does not even have so much as the opportunity to negotiate, correct?

To answer that question, first allow me to set the stage with some binding precedent: In 1999, in the employment discrimination case of Stafne v. Trevilla of New Brighton, Inc. (Case No. 99-3562), the United States Court of Appeals for the Eighth Circuit declined to rule on Ms. Stafne's plight regarding the judge's misallocation of the burden of proof in the "direct threat" exception. The Eighth Circuit Court of Appeals felt that the issue was moot, as Ms. Stafne failed to even establish a prima facie case of discrimination, meaning that she would have lost anyway. See Exhibit H. It took another seven years, in the 2006 case of EEOC v. Wal-Mart Stores, Inc. (Case No. 06-1583), when this question actually became pertinent, that the Eighth Circuit Court of Appeals actually decided to rule on it, and state that the defendant holds the burden of proof. See Exhibit I.

I say that to say this: Even though a legal question may seem important, and *should* be answered, eventually, the Stafne case sets binding precedent that a court must disregard all moot

points, even if they appear pertinent at first glance, and render decisions only on points that will actually make or break the outcome of the case at hand.

To that end, I pose this question: If Wal-Mart had responded with either an unambiguous rejection, or a counter-offer, would they have still been bound? We don't know; we don't care. The court need not rule on whether they could have been exempt if they had contacted me, but only to explicitly reject the offer, or make a counter-offer, because they did neither. Wal-Mart initiated communications with me, only to invite me for more communications.

It would be as if I emailed a friend of mine, with this formal offer for a contract, and, being the smartypants frat boy that this friend is, he responded saying "I'M COMMUNICATING WITH YOU! I'M COMMUNICATING WITH YOU!" over and over again. At that point, he probably would be deemed to have accepted the contract, even if the court would not have found acceptance if he made a genuine attempt to make a rejection or counter-offer, correct?

For this reason, I respectfully move that you expressly save, for another day, the question of whether or not an unambiguous rejection or counter-offer would have been deemed an acceptance of this contract, and, instead, rule on whether or not the actions they *did* take signified acceptance.

To that end, allow me to cite a persuasive precedent. This case is called Ticketmaster II v. Tickets.com, and took place in the United States District Court for the Central District of California. See Exhibit J. I will hereby abbreviate this case as "the Tickets case" or simply "Tickets" from here on out.

Tickets concerned a browse-wrap agreement – an online contract that binds the parties simply by browsing on that website. Browse-wrap agreements are distinguished from click-wrap agreements, which require the user to actually check a box that says "I agree to the terms of

service," prior to creating an account on that website. Click-wrap agreements are typically enforced quite consistently, but browse-wrap agreements are much more controversial.

However, Tickets seems to shine some light on that issue. The defendants in the case managed to get the claim dismissed, yes, but the court explicitly stated that the reason it dismissed the case was because the plaintiff had yet to prove that the defendants had actual knowledge of the terms and conditions of using the website.

This seems to hint at a critical matter of law: While you might be able to escape liability for a contract that you did not even see, once the plaintiff proves that the defendant did see the contract, and, after seeing the contract, still performs actions that signify their acceptance, then that's it; game over. Once the defendants in a contract suit see a contract (such as a a browse-wrap agreement, or a sign posted on a main door that says "Read this before entering,") and still perform actions that the contract states will signify acceptance, then they accept the contract, plain and simple. At that point, lack of acceptance is not going to get the defendants very far; they will have to plead something else, such as the lack of a different element, and/or an affirmative defense.

For example, in computers, there is a concept called "cookies." These monitor everything you do on a website; they are designed to give the surfer a customized experience, based on the surfer's unique surfing habits. However, in order to know about the surfer's unique surfing habits, the websites must monitor their surfing. This is accomplished with a small piece of software called "cookies."

Therefore, if a plaintiff in a breach of contract case concerning a browse-wrap agreement managed to use cookies to prove that the defendant had, at some point, read the terms of service, and did *not* immediately navigate away from that website, and never return, then the reasonable

person may assume that they accepted the terms of service.

However, holding a defendant to a browse-wrap agreement does not necessarily have to be so hard to prove. If the website looking to enforce a browse-wrap agreement had a link to their terms of use, not at the bottom of every webpage on their site, but at the top, then it would still be a valid and enforceable contract. The browsers do not have to click on the terms; they were in plain view, and that is enough.

Another example is a sign posted on a door that states "Read this before entering." If the sign is clearly visible, to the point where any reasonable person would see it, even if they do not stop and read it, then it is valid. At that point, if a person walks through the door, he will have accepted the terms stated on that sign, would he not? If security cameras showed that he actually stopped to read the sign, that would merely serve as a *ad abundantiam* – adding strength to an already valid case.

As I stated before, Wal-Mart performed an action that signified their acceptance to my contract on Wednesday, November 17, 2010. I reminded them of exactly what they were getting themselves into, on November 21, 2010, and then, on November 24, 2010, they performed actions that signified their acceptance to the contract, *again*!

On November 21, I laid everything out in black and white. I held nothing back. Even if they did not bind themselves on November 17, they definitely did on November 24. There are no more excuses.

Simply put, Wal-Mart accepted the contract, and that's all there is to it. Now, we move onto the third element of a contract: Consideration.

**Wal-Mart and I must arbitrate all legal disputes.**

First, allow me to cite binding precedent: The Supreme Court case of Buckeye Check

Cashing Inc. v. Cardegna (to be abbreviated as "Cardegna" from here on out) states, without ambiguity, that, if a contract contains an arbitration clause, the arbitrator must decide the validity of the contract, unless the arbitration clause itself is being challenged.  See Exhibit K.

The issue in dispute involved legality of a contract (violating Florida's usury laws), but the majority opinion clearly mandated, and I quote, "a challenge to the <u>validity</u> of a contract as a whole, and not specifically to the arbitration clause within it, must go to the arbitrator, not the court."  The word "validity" is underlined for emphasis.

The validity of a contract encompasses all seven elements of a contract.

Therefore, the consideration of the contract, in its entirety, is out of your hands.  You must look at the contract as if it stated nothing but the following:

"By initiating communications with me, in any way [other than to explicitly reject this contract], you hereby agree to submit all legal disputes with me – not just those related to this contract – to semi-binding arbitration, using the services of www.net-arb.com, where you are bound, by I am not."

That is it.  That is all you can consider in making your ruling.  Even the validity of the forfeit victory clause is our of the court's hands.  In the event that there is a dispute as to the validity of the forfeit victory clause, it is still something that the arbitrator must decide.

Therefore, there is sufficient consideration.  We both save time and money by referring all legal disputes to arbitration, unless the legal disputes at hand is not referable to arbitration.  That, in and of itself, is consideration.  In fact, the consideration in an agreement to arbitrate is so blatant that it can often stand alone as its own contract (i.e. when parties agree to arbitrate a legal dispute that has already arisen, and only agree to arbitrate that one case).  Granted, there is a lack of mutual consideration, but, as I will soon explain, even that will not help Wal-Mart.

Conclusively, there is sufficient consideration – albeit peppercorn consideration - in this contract, up to the point that the court is authorized to decide. Now, we move on to the fourth element of a contract: Intent to be legally bound.

**A reasonable person would have intended to arbitrate all cases with me.**

Allow me to set the stage, not with binding precedent, or even persuasive precedent, for that matter, but with common sense that any jurist – even an amateur one, such as myself – would know: Intent to be legally bound is not based on each parties' subjective intent, but on the common law doctrine of the reasonable person. If a defendant in a contract case claims that he never expected the plaintiff to actually sue him over this contract, that is just his tough luck. A reasonable person would realize that there is an intent to be legally bound. If the court looks at each parties' subjective intent, do you have any idea the kind of floodgates you would be opening? Anybody could escape liability for virtually any contract, by merely claiming that they did not intend to be legally bound, and, then, it would be the plaintiff's neigh impossible burden to prove that the defendants did intend to be legally bound.

This burden is much easier to prove if the contract explicitly states that the parties agree to be bound. This contract did, indeed, state the ability to be bound. Therefore, there was an intent to be legally bound. Wal-Mart is better off pleading the lack of some other element of a contract, or some other affirmative defense.

As capacity is not in dispute, by any stretch of the imagination, I now move to the sixth element of a contract: Meeting of the minds.

**There is objective indication of assent.**

I cite the 1995 Arkansas Supreme Court case of Thurman v. Thurman. Per the Erie Doctrine, this case sets binding precedent on this district court. This case has been cited,

numerous times, by Arkansas Appellate Court cases. The case states that "meeting of the minds" is not based on the parties' subjective understanding of the terms, but on "objective indicators of assent." I cannot find the exact text of Thurman, but there is a good reason for that: It was passed in the year 1995. Unless I pay a large fee, which I don't have, I can only look up cases that date as far back as 1996. I can, however, cite an Arkansas Court of Appeals case that makes direct reference to this AR Supreme Court case; I will do exactly that. I will cite the 2002 Arkansas Court of Appeals case of Shea v. Riley. See Exhibit L.

This phrase, "objective indicators of assent," seems to imply two things: First, the establishment of "meeting of the minds" is based on whether or not two reasonable people – as defined by common law – would have a meeting of the minds. Second, the phrase "objective indicators" seems to imply that, in Arkansas, meeting of the minds is neigh indistinguishable from "acceptance," which I have already established.

My original offer, as well as my reiteration, was clear and unambiguous. The contract offer that I made is in the same language that I have seen numerous contracts be in. No reasonable person, upon actually reading the contract (which, as I have established by citing the Tickets case, is a lot more moot than you may initially give it credit for) would have been confused as to the terms. Instead, it is much more plausible that Wal-Mart committed a unilateral mistake. However, as I will soon explain, the affirmative defense of "unilateral mistake" is not a valid affirmative defense.

I now move on to the seventh and final element of a contract: Legality.

**It is legal to refer civil disputes to arbitration.**

As I have previously stated, the arbitration agreement is all that you have jurisdiction to consider. As a direct result, you must consider the legality of the arbitration clause, alone. In

fact, the very case that sets binding precedent on this issue – Cardegna – concerned the <u>legality</u> of the contract as a whole!  Theoretically, I could have a contract with a hitman, and, as long as there's an arbitration clause, it is out of your hands.  The actual murder itself may be referable to court, as it is a matter of criminal law, but the contract, and the breach thereof, is still in the hands of the arbitrator.

Therefore, as it is legal to refer civil disputes to binding arbitration, then the contract is legal, period.

I now move on to what I perceive as the most likely reason that Wal-Mart accepted the contract:  Unilateral mistake.

### There was no fraud, and, therefore, no unilateral mistake.

Allow me to cite the precedent-setting case of Beckton, Dickson, & Company v. Accu-Path Medical Laboratory, Inc (Case No. 01-1907).  See Exhibit M.  In it, the United States Court of Appeals for the Eighth Circuit stated that "Arkansas law requires fraud before rescinding or reforming a contract because of a unilateral mistake, see Westlund v. Melson, 647 S.W.2d 488, 489 (Ark. Ct. App. 1983)."

There was no fraud in any of this.  I did not lie to them about anything.  I told them everything, in black and white.  It is their fault, for not actually listening.

As an *ad abundantiam*, I cite the semi-binding precedent of HealthEast Bethesda Hospital v. United Commercial Travelers of America (Case No. 08-3665).  See Exhibit N.  This was in the Eighth Circuit, but applies Minnesota state law, as that was the state that would otherwise have personal jurisdiction, but for the federal courts having jurisdiction, which is why I call this precedent "semi-binding."

Anyway, in that case, the Eighth Circuit Court of Appeals affirmed the ruling of the

District Court for the District of Minnesota, which denied the defendants' affirmative defense of unilateral mistake. The reason for this denial is that "it was a sophisticated party that bore the risk of mistake and could have avoided it by investigating Hansen's policy." Remember, the district court's reasoning was affirmed, therefore, making this reasoning binding precedent.

As a result, defeating the affirmative defense of "unilateral mistake" is as easy as proving that Wal-Mart is as sophisticated a company, or more so, than the UCT, and proving that they could have easily avoided the mistake, if they had merely taken greater care.

The sophistication of Wal-Mart is a given. I do not even need to cite any sources; everyone knows that Wal-Mart is the biggest retailer in the world, and practically has a sinkhole of resources at their disposal.

Could they have easily avoided the mistake, if they had taken greater care? You tell me! I sent the offer to them, twice. On the second time, I explained to them what they were getting themselves into. It merely fell on deaf ears, but that is not my problem. They could have easily know what was going on, if they just took two minutes, upon actually getting around to reading my email, and actually read it, instead of just glancing over it, deciding that I'm in over my head, and calling my bluff.

If you rule against me for this reason, Your Honor, not only will you violate clear binding precedent that states, without ambiguity, that fraud is prerequisite to relief on the basis of unilateral mistake, but you would be opening the flood gates for a ton of abuse. Virtually anyone could get off the hook, on a contract, because they didn't read it. If Wal-Mart 1) posted a sign on their front door, 2) that sign is in plain view, 3) the sign states that, by entering the store, the consumers agree to be bound by the following terms, and 4) a consumer simply ignores the sign, and walks into the store without blinking an eye, they should not be bound by the terms.

I now move on to the second most likely defense: The arbitration agreement lacks mutuality of obligation.

### Mutuality of obligation is a non-issue in federal court

I cite the 2008 case of Southeastern Stud & Components, Inc. v. American Eagle Design Build Studios, LLC (Case No. 08-3448), or SSC v. AEDBS, for short. See Exhibit O. In this case, the United States Court of Appeals for the Eighth Circuit ruled that "mutuality of obligation is not required for arbitration clauses so long as the contract as a whole is supported by consideration."

So, at this point, it merely becomes a matter of establishing consideration.

I concede that the arbitration agreement only called for semi-binding arbitration, but that is all I need. Remember, in the case of SSC v. AEDBS, the arbitration agreement contained even less obligation, on the part of AEDBS, than mine does. AEDBS still retained the right to initially litigate any disputes, whereas I must initially refer all cases to arbitration. Only after the arbitration is over, may I decide whether to take that arbitration award, and run with it, or risk it all for a better judgment in litigation.

AEDBS had the option of whether or not to even so much as compel arbitration. They lacked a single commitment in the arbitration clause, alone. Therefore, the court had to look elsewhere for consideration. I, on the other hand, have to initially refer all cases to arbitration, unless the case cannot be arbitrated, as a matter of public policy.

I need but a single peppercorn of consideration, on my part, for the contract *as a whole* to be supported by consideration. The contract, as a whole, therefore, has consideration, negating the need for the arbitration agreement to have equality of obligation. I have established exactly that.

I am curious – even eager – to hear any other affirmative defenses that they might want to raise.

However, whether this contract is enforceable or not, there is one thing that this case is not, and that is a frivolous lawsuit. "Frivolous," in the eyes of the law, has a very different definition than in the eyes of the general public; case in point, McDonald's Coffee. To be frivolous, in the eyes of the law, it must be one that has absolute, positively, **no** possible legal basis, upon which it can be based. I have cited numerous case laws that affirm my position on this case, which means that there is a possible legal basis.

Wherefore, I respectfully pray that you promise to confirm the arbitration award that I have, due to the forfeit victory clause, or, alternatively, compel Wal-Mart to arbitrate the validity of the forfeit victory clause with me, and award other relief as the court deems appropriate.

Sincerely,

David Stebbins

Notice to companies by David on Myspace
Case 3:10-cv-03086-RTD    Document 19-1    Filed 02/18/11    Page 17 of 60 PageID #: 55
Page 2 of 4

Exhibit D

pg 13

Stream
Friends
Comments
Badges

**David's Blog**
☐ New blog post Rss

Nov 8, 2010
**Notice to companies**

My name is David Anthony Stebbins, and I live in Harrison, AR. I am sending a link to
this webpage to various companies to put you on notice: If you contact me in any way,
shape, or form, you hereby acknowledge that you have read, understand, and agree to be
legally bound by the terms below.



You hereby agree that you, as well as any principal or employer that you are acting on
behalf of, will initially attempt settle all legal disputes, even those not relating to this
contract, by semi-binding arbitration using the services of www.net-arb.com, where
you are bound, but I am not.

Springfield Criminal Atty
Randell Wood - tough and aggressive
defense of your criminal case.
www.WoodLaw.com

Ads by Google

Pg 14

Exhibit D

If you do not accept my invitation to arbitrate within 24 hours, then I automatically win the amount I request, regardless of the merits of the case.



1:04 PM

Comment · Like

## Comments

Post a comment...

Privacy

**Privacy**

Privacy Policy
Learn more

**Around Mysp**

Music
Video
Movies
Televisio
Celebrity

Exhibit C

pg 19




Yahoo! Mail (stebbina) - Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

http://us.mg3.mail.yahoo.com/dc/launch?.gx=1&.rand=7j6fcpd990

YM Yahoo! Mail (stebbina)

YAHOO! MAIL   Hi, David   Offline   Sign Out   Yahoo! Games   Help

Check Mail   New ▼          What's New   Legal Emails   Search: "Ref #0000000...   Response from Wal-Mar ×

Q: (C0002e901415) Go

View Your
2010 Credit Score

Inbox
Drafts
Sent
Spam (2)
Trash

Contacts

▼ Folders
  aina
  DME Hosting
  Ebay
  Forum subscriptions
  Friends
  Tunnies
  Important sent emails
  Legal
  references
  saved emails
  Youtube (1)

Response from Wal-Mart Stores, Inc. (Ref #000000026901415)

From Walmart Customer Service <online_help@walmart.com>   Add to Contacts
To stebbina@yahoo.com

Thank you for your message.

Dear David

Thank you for your recent correspondence. Your message has reached the office that exclusively assists with customer-related matters. In order to obtain the best assistance with your associate/open door issue, we would suggest contacting your Market Manager, Linden Murphy at ☎ (479) 621-9789 ). If he/she is not currently in the office, you may also speak to the Market Manager's assistant.

Sincerely,
Walmart Customer Care

For further correspondence regarding this issue, please reply to this email.

-----Your Original Comments Were-----

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom they are addressed. If you have received this email in error destroy it immediately.

*** Walmart ***

Confidential ***



Done

*Exhibit QD*

*pg 16*



**Re: Response from Wal-Mart Stores, Inc. (Ref #0000002690I4I5]**

From: David Stebbins <stebbinsd@yahoo.com> - Wal-Mart to Yahoo! Customer Service <customerservice@walmart.com>

Sun, November 21, 2010 11:11:11 PM

Wal-mart,

Apparently, you weren't aware of this, so here it is:

On November 8, 2010, I sent you a formal contract offer, via email. The email stated that, if you initiate communications with me, or if I initiate communications with you, and you entertain said attempt to communicate, you are bound by that contract.

You accepted that offer on November 11, 2010, when I purchased a gallon of milk from you, using a paper check. This check had my name and street address on it, so you knew who I was. Also, your employees asked to see my ID, and I showed them my driver's license, so you had every opportunity to know who I was, then.

Here is the contract that you entered into with me.

http://www.megavideo.com/?d=artfiediavid1Hhjrss_B4Q0GCd42

So, now, we must hold all legal disputes via arbitration, whether you like it or not!

Thank you for your time.

Sincerely,
David Stebbins

From: Walmart Customer Service <csreply@wal-mart.com>
To: stebbinsd@yahoo.com
Sent: Wed, November 17, 2010 4:53:27 PM
Subject: Response from Wal-Mart Stores, Inc. (Ref #0000002690I4I5)

Exhibit DE.

Pg 21



# Response from Wal-Mart Stores, Inc. (Ref #0000000259001415)

From: Walmart Customer Service <service@wal-mart.com> Add to Contacts
To: dshines@gmail.com

Wed November 24 2010 4:12:48 PM

Thank you for your message.

Dear David

Thank you for your recent correspondence. Your message has reached the office that exclusively assists with customer-related matters. In order to obtain the best assistance with your associate open door issue, we would suggest contacting your Market Manager, Lindon Murphy at ☎ - (479) 621-97584● ). If he/she is not currently in the office, you may also speak to the Market Manager's assistant.

Sincerely,
Walmart Customer Care

For further correspondence regarding this issue, please reply to this email.

---- Your Original Comments Were----

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom they are addressed. If you have received this email in error destroy it immediately.

*** Walmart

Confidential ***



pg 18

Exhibit OFF



### net-ARB Registration Confirmation

From  net-ARB.com <support@net-ARB.com>  Add to Contacts
To  s.stebbins@yahoo.com

Wed, November 24, 2010 6:36:36 PM

David Stebbins vs. Wal-Mart Stores, Inc.
Case No. 2952477
11/24/2010

Your registration for Case No. 2952477 is confirmed. We have just sent an email to the other party at "catreply@wal-mart.com" with a copy to you. If the other party's email address is not correct, please reply to this email with the corrected email address.

If you have not spoken with the other party yet about using net-ARB, we urge you to contact them immediately. People are much more receptive when they have notice that you are asking them to arbitrate. There is also danger that if the other party is not expecting our email, it could be filtered or deleted without being read. Please remind them to enable emails from net-ARB.com and to check their spam folder if they have not already received our first email.

We invite you to visit the Arbitration Tips page on our website so that you can be better prepared for your hearing. You will receive status updates and further instructions when we hear from the other party.

Thank you for trusting net-ARB for your dispute resolution.

net-ARB Support
Online Arbitration

Case Description
Wal-Mart discriminated against me in employment, by asking me interview questions that have the disparate impact of discriminating against people with Asperger Syndrome (my disability), despite the questions having nothing to do with the jobs that I was applying for. They then retaliated against me when I announced my intent to sue them, and refused to consider any further application of mine for that reason. Due to a contract that I have with Wal-Mart, I want $660,000,000,000.00 in damages.

Exhibit G

pg 19



## net-ARB Case Status Update

From: net-ARB Internet Arbitration support@net-ARB.com  Add to Contacts
To: stdchbes@yahoo.com

Sat, December 4, 2010 4:42 PM

Re: net-ARB Case No. 2952477

This is an automated message to let you know that we still have not heard from Wal-Mart Stores, Inc. We have just sent another notice to 'csreply@wal-mart.com'

You can help by contacting Wal-Mart Stores, Inc. yourself and discussing whether or not to go forward with arbitration. Also, please remind the other party to adjust their spam filter to enable emails from net-ARB and to check their spam folder if necessary, for the email we sent when you filed the case.

Please address any new information you have to: support@net-ARB.com

Thank you,
net-ARB Support

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3562

_____

Marion R. Stafne,                          *
                                           *
            Appellant,                     *
                                           *   Appeal from the United States
       v.                                  *   District Court for the District
                                           *   of Minnesota.
Unicare Homes, d/b/a                       *
Trevilla of New Brighton, Inc.,            *
                                           *
            Appellee.                      *
                                           *
--------------------------------------     *
                                           *
Equal Employment Opportunity               *
Commission,                                *
                                           *
       Amicus on Behalf of Appellant.      *

_____

Submitted:  November 17, 2000

Filed:  October 1, 2001

_____

Before LOKEN, LAY, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Trevilla of New Brighton, Inc., fired Marion Stafne after she developed rheumatoid arthritis, a condition that greatly limited her ability to walk and perform the

We also hold that the record in this case could not in any event have supported a finding that Trevilla failed to engage in an interactive process with her. The proof showed that Ms. Stafne and Trevilla had numerous discussions concerning her proposed use of an Amigo for work. In particular, Trevilla met with Ms. Stafne and her vocational rehabilitation counselor to investigate whether an Amigo could be used in Trevilla's dining room area. It does not seem to us, therefore, that there is sufficient evidence in this case to find that Trevilla did not act in good faith in attempting to provide Ms. Stafne with a reasonable accommodation. *See Treanor v. MCI Telecomm. Corp.*, 200 F.3d 570, 575 (8th Cir. 2000).

Ms. Stafne also maintains that the district court erred when it instructed the jury that she had the burden to prove that her disability did not make her a direct threat to anyone's safety at her work. She argues that the district court misallocated the burden because the issue of direct threat was an affirmative defense raised by Trevilla; thus, the argument runs, Trevilla should have been the party obligated to prove that she was a danger to others. We need not address this argument, however, because, as we have explained, Ms. Stafne's failure to present a submissible case renders harmless any errors in the jury instructions.

## II.

To prove her retaliation claim, Ms. Stafne had to establish that she engaged in a statutorily protected activity, that her employer took an adverse action against her, and that there was a causal link between the two. *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999). Ms. Stafne contended below that Trevilla fired her because she filed a charge with the EEOC complaining about Trevilla's unwillingness to allow her to use an Amigo.

With regard to her retaliation claim, Ms. Stafne argues that the district court should have allowed the jury to hear a message that her supervisor left on her answering machine on the day that she was terminated, a message that stated, in part,

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 06-1583

---

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Wal-Mart Stores, Inc., | * | |
| | * | |
| Appellee. | * | |

---

Submitted: November 16, 2006
Filed: February 13, 2007

---

Before RILEY, HANSEN, and SMITH, Circuit Judges.

---

SMITH, Circuit Judge.

   The Equal Employment Opportunity Commission (EEOC) brought this action against Wal-Mart Stores, Inc. ("Wal-Mart"), alleging that Wal-Mart violated the Americans with Disabilities Act (ADA). The EEOC contends that Wal-Mart improperly refused to hire Steven Bradley because of mobility limitations caused by cerebral palsy. The district court granted Wal-Mart's motion for summary judgment, concluding that (1) Bradley's impairment rendered him unqualified for the positions of greeter and cashier and that (2) insufficient evidence existed from which a reasonable factfinder could conclude that Wal-Mart's reasons for not hiring Bradley were pretextual. We hold that material facts remain in dispute and therefore reverse.

Because the EEOC provided sufficient evidence that Wal-Mart's stated reasons for not hiring Bradley were pretextual, we hold that the district court erred in granting summary judgment to Wal-Mart on the EEOC's discrimination claim.

### C. *Direct Threat*

Wal-Mart argues that the "direct threat" affirmative defense provides this court with an alternative basis for upholding the district court's grant of summary judgment in its favor.

"[S]ummary judgment would still be appropriate under the ADA if [Bradley] posed 'a direct threat to the health or safety of other individuals in the workplace.'" *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (quoting 42 U.S.C. § 12113(b)). A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see also* 29 C.F.R. § 1630.2(r).

The Supreme Court requires an individualized direct threat analysis that relies on the "best current medical or other objective evidence" in order to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Nunes*, 164 F.3d at 1248 (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998); *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273 (1987)). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Id.*

Although we have previously declined to resolve which party bears the burden of proving direct threat, *Stafne v. Unicare Homes*, 266 F.3d 771, 775 (8th Cir. 2001), we now hold that the employer bears the burden of proof, as the direct threat defense is an affirmative defense. *See Nunes*, 164 F.3d at 1247; *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220 (2d Cir. 2001) ("The legislative history of the

**Ticketmaster Corp. v. Tickets.com, Inc.**

United States District Court for the Central District of California

2003 U.S. Dist. LEXIS 6483

March 6, 2003, Decided

March 7, 2003, Filed

This motion by defendant Tickets.com, Inc. (hereafter TX) for summary judgment on plaintiffs Ticketmaster Corporation and Ticket Online-CitySearch, Inc. (hereafter collectively TM), intellectual property issues is denied as to the contract claim of TM and granted as to the copyright and trespass to chattels claims, which are dismissed by this minute order.

At this point in the case, both parties have narrowed their claims. TM, the original plaintiff, has narrowed its intellectual property claims to a contract theory, a copyright theory, and a trespass to chattels theory. The court finds triable issues of fact on the contract theory and finds no triable issues of fact and grants summary judgment on the copyright and trespass to chattels claims.

Many of the factual items are not contested, although the legal result of applying the law to the uncontested facts is heavily contested. Among the uncontested facts are the following: Both TM and TX are in the business of selling tickets to all kinds of "events" (sports, concerts, plays, etc.) to the public. They are in heavy competition with one another, but operate in distinctive ways. TM is the largest company in the industry. It sells tickets by the four methods of ticket selling--venue box office, retail outlets, by telephone, and over the internet. Telephone and internet sales require the customer to establish credit with the ticket seller (usually by credit card). Internet sales have been the fastest growing segment of the industry. TX at the time of the events considered in this motion was primarily (but not exclusively) an internet seller. Both TM and TX maintain a web page reachable by anyone with an internet connection. Each of their web pages has many subsidiary (or interior) web pages which describe one event each and provide such basic information as to location, date, time, description of the event, and ticket prices. The TM interior web pages each have a separate electronic address or Uniform Resource Locator ("URL") which, if possessed by the internet user, allows the user to reach the web page for any particular event by by-passing the "home" web page and proceeding past the index to reach the interior web page for the event in question. The TM interior web pages provide telephone numbers for customers or allow the customer to order tickets to the event by interactive computer use. A charge is made for the TM service.

TM principally does business by exclusive contracts with the event providers or their producers, and its web pages only list the events for which TM is the exclusive ticket seller. TX also sells tickets to a number of events for which it is the ticket seller. At one point, its web pages attempted to list all events for which tickets were available whether or not TX sold the tickets. Its interior web pages also listed the event, the date, time, ticket prices, and provided for internet purchase if TX could sell the tickets. When TX could not sell the tickets, it listed ticket brokers who sold at premium prices. In early 2000, TX discontinued this practice of listing events with tickets sold by other ticket brokers. Until early 2090, in situations where TM was the only source of tickets, TX provided a "deep link" by which the customer would be transferred to the interior web page of TM's web site, where the customer could

purchase the ticket from TM. This process of "deep linking" is the subject of TM's complaint in this action, of which there is now left the contract, copyright, and trespass theories.

Starting in 1998 and continuing to July 2001, when it stopped the practice, TX employed an electronic program called a "spider" or "crawler" to review the internal web pages (available to the public) of TM. The "spider" "crawled" through the internal web pages to TM and electronically extracted the electronic information from which the web page is shown on the user's computer. The spider temporarily loaded this electronic information into the Random Access Memory ("RAM") of TX's computers for a period of from 10-15 seconds. TX then extracted the factual information (event, date, time, tickets prices, and URL) and discarded the rest (which consisted of TM identification, logos, ads, and other information which TX did not intend to use; much of this discarded material was protected by copyright). The factual information was then organized in the TX format to be displayed on the TX internal web page. The TX internal web page carried no TM identification and had only the factual information about the event on it which was taken from TM's interior web page but rearranged in TX format plus any information or advertisement added by TX. From March 1998, to early 2000, the TX user was provided the deep linking option described above to go directly from the TX web site to the relevant TM interior web page. This option stopped (or was stopped by TM) in early 2000. For an unknown period afterward, the TX customer was given the option of linking to the TM home page, from which the customer could work his way to the interior web page in which he was interested. (The record does not reveal whether this practice still exists or whether TM objects to it.) Thus, the intellectual property issues in this case appear to be limited to events which occurred between November 1998, when spidering started, and July 2001, when it stopped. The "deep linking" aspect of the case is relevant only from March 1998, to early 2000, when it stopped.

The contract aspect of the case derives from a notice placed on the home page of the TM web site which states that anyone going beyond that point into the interior web pages of the web site accepts certain conditions, which include, relevant to this case, that all information obtained from the website is for the personal use of the user and may not be used for commercial purposes. Earlier in this case (and at the time of the motion for preliminary injunction) the notice was placed at the bottom of the home page of the TM web site, so that a user without an especially large screen would have to scroll down the page to read the conditions of use. Since then, TM has placed in a prominent place on the home page the warning that proceeding further binds the user to the conditions of use. As one TX executive put it, it could not be missed. At the time of the preliminary injunction motion, the court commented that there was no evidence that the conditions of use were known to TX. Since then, there has been developed evidence that TX was fully familiar with the conditions TM claimed to impose on users, including a letter from TM to TX which quoted the conditions (and a reply by TX stating that it did not accept the conditions). Thus, there is sufficient evidence to defeat summary judgment on the contract theory if knowledge of the asserted conditions of use was had by TX, who nevertheless continued to send its spider into the TM interior web pages, and if it is legally concluded that doing so can lead to a binding contract. For reasons dealing with the desirability of clear unmistakable evidence of assent to the conditions on trial of such issues, the court would prefer a rule that required an unmistakable assent to the conditions easily provided by requiring clicking on an icon which says "I agree" or the equivalent. Such a rule would provide certainty in trial and make it clear that the user had called to his attention the conditions he or she accepted when using the web site. (The court notes that Professor Lemley also approves this approach, but this is treated as a legal opinion, not a fact). However, the law has not developed this way. Use of a cruise ship ticket with a venue provision printed on the back commits one to the venue provided. (Carnival Cruise Lines v. Shute ('91), 499 U.S. 585, 113 L. Ed. 2d

622, 111 S. Ct. 1522.) The Carriage of Goods by Sea Act, the Carmack Act, and the Warsaw Convention provide that limitations of liability on the bill of lading, air waybill, or airplane ticket are enforceable if the services are used by the customer. The "shrinkwrap" cases find the printed conditions plainly wrapped around the cassette or CD enforceable. Even the back of your parking lot ticket may be enforceable. The principle has been applied to cases similar to this. (Register.com, Inc. v. Verio, Inc. (SDNY'00) 126 FSupp2d 238; Pollstar v. Gigmania Ltd. (EDCA'00) 170 FSupp2d 974.) The principle has long been established that no particular form of words is necessary to indicate assent-the offeror may specify that a certain action in connection with his offer is deemed acceptance, and ripens into a contract when the action is taken. (Binder v. Aetna Life Ins. Co. ('99) 75 Cal. App. 4th 832, 89 Cal. Rptr. 2d 540; Penn Sec. Life Ins. Co. v. Rising 62 CA3d 302, 133 Cal. Rptr. 59.) Thus, as relevant here, a contract can be formed by proceeding into the interior web pages after knowledge (or, in some cases, presumptive knowledge) of the conditions accepted when doing so. In Specht v. Netscape Communs. Corp. (2Cir'02) 306 F.3d 17, the court found that there was no mutual assent when a notice of the existence of license terms governing the use of software was visible to internet users only if they scrolled down the screen. That case is distinguishable from the facts at hand on the grounds that in Specht, the plaintiff's terms of use were not plainly visible or known to defendants. See id. at 31. Moreover, Specht involved a different set of circumstances, that of consumers invited to download free software from an internet site that did not contain a plainly visible notice of license terms. See id. at 32. As a result, the TX motion for summary judgment on the contract issue is denied.

The trespass to chattels issue requires adapting the ancient common law action to the modern age. No cases seem to have reached the appellate courts although there appears to be a number of district court cases. One case (Intel Corp. v. Hamadi ('01) 94 Cal. App. 4th 325, 114 Cal. Rptr. 2d 244) is pending in the California Supreme Court since it granted a hearing which has the effect of vacating the state Court of Appeal opinion (and which has no precedent value once the hearing was granted). The court is informed that the eBay, Inc. v. Bidder's Edge, Inc. (NDCA'00) 100 F. Supp. 2d 1058 preliminary injunction was not appealed. At the time of the preliminary injunction motion, only the eBay case was before the court. Since then, there have been a number of district court cases discussing the chattel theory (some published and some not). These cases tend to support the proposition that mere invasion or use of a portion of the web site by a spider is a trespass (leading at least to nominal damages), and that there need not be an independent showing of direct harm either to the chattel (unlikely in the case of a spider) or tangible interference with the use of the computer being invaded. However, scholars and practitioners alike have criticized the extension of the trespass to chattels doctrine to the internet context, noting that this doctrinal expansion threatens basic internet functions (i.e., search engines) and exposes the flaws inherent in applying doctrines based in real and tangible property to cyberspace. See, Laura Quilter, Cyberlaw: The Continuing Expansion of Cyberspace Trespass to Chattels, 17 Berkeley Tech. L. J. 421 (2002); Clifton Merrell, Trespass to Chattels in the Age of the Internet, 80 Wash. U. L. Q. 675 (2002); Mary Anne Bendotoff and Elizabeth R. Gosse, "Stay Off My Cyberproperty!": Trespass to Chattels on the Internet (2001), 6 Intell. Prop. L. Bull. 12; Edward Lee, Rules and Standards for Cyberspace, 77 Notre Dame L. Rev. 1275, 1283-1284 (2002). Pending appellate guidance, this court comes down on the side of requiring some tangible interference with the use or operation of the computer being invaded by the spider. Restatement (Second) of Torts § 219 requires a showing that "the chattel is impaired as to its condition, quality, or value." Therefore, unless there is actual dispossession of the chattel for a substantial time (not present here), the elements of the tort have not been made out. Since the spider does not cause physical injury to the chattel, there must be some evidence that the use or utility of the computer (or computer network) being "spiderized" is adversely affected by the use of the spider. No such evidence is presented here. This court respectfully disagrees with other district courts' finding that mere use of a spider to enter a publically available web site to

gather information, without more, is sufficient to fulfill the harm requirement for trespass to chattels.

TM complains that the information obtained by the use of the spider was valuable (and even that it was sold by TX), and that it spent time and money attempting to frustrate the spider, but neither of these items shows damage to the computers or their operation. One must keep in mind that we are talking about the common law tort of trespass, not damage from breach of contract or copyright infringement. The tort claim may not succeed without proof of tort-type damage. Plaintiff TM has the burden to show such damage. None is shown here. The motion for summary judgment is granted to eliminate the claim for trespass to chattels. This minute order is the order eliminating that claim. This approach to the tort of trespass to chattels should hurt no one's policy feelings; after all, what is being attempted is to apply a medieval common law concept in an entirely new situation which should be disposed of by modern law designed to protect intellectual property interests.

The copyright issues are more difficult. They divide into three issues. The first is whether the momentary resting in the TX computers of all of the electronic signals which are used to form the video representation to the viewer of the interior web pages of the TX computer constitutes actionable copyright infringement. The second is whether the URLs, which were copied and used by TX, contain copyrightable material. The third is whether TX's deeplinking caused the unauthorized public display of TM event pages. In examining these questions, we must keep in mind a prime theorem of copyright law--facts, as such, are not subject to copyright protection. What is subject to copyright protection is the manner or mode of expression of those facts. Thus, addresses and telephone numbers contained in a directory do not have copyright protection (Feist Publications v. Rural Tel. Serv. Co., 499 U.S. 340, 113 L. Ed. 2d 358, 111 S. Ct. 1282), despite the fact that time, money, and effort went into compiling the information. Similarly, in this case, the existence of the event, its date and time, and its ticket prices, are not subject to copyright. Anyone is free to print (or show on the internet) such information. Thus, if TX had sat down a secretary at the computer screen with instructions manually to go through TM's web sites and pick out and write down purely factual information about the events, and then feed it into the TX web pages (using the TX distinctive format only), no one could complain. The objection is that the same thing was done with an electronic program. However, the difference is that the spider picks up all of the electronic. symbols which, if it had been put on a monitor with the right software, would duplicate the TM web page. However, this is not the way it was done. The spider picks up the TX electronic symbols and loads them momentarily (for 10 to 15 seconds) into the RAM of the TX computers, where a program picks up the factual data (not protected), places same into the TX format for its web pages, and immediately discards the balance, which may consist of TM logos, TM advertisements, TM format for presentation of the material, and other material which is copyrightable. Thus, the actual copying (if it can be called that) is momentary while the non-protected material, all open to the public, is extracted. Is this momentary resting of the electronic symbols from which a TM web page could be (but is not) constructed fair use where the purpose is to obtain nonprotected facts? The court thinks the answer is "yes". There is not much law in point. However, there are two Ninth Circuit cases which shed light on the problem. They are Sony Computer Entm't, Inc. v. Connectix Corp. (9Cir'00) 203 F3d 596 and Sega Enters. v. Accolade, Inc. (9Cir'92) 977 F2d 1510. In each of these cases, the alleged infringer attempted to get at non-protected source code by reverse engineering of the plaintiff's copyrighted software. In doing so, the necessary method was to copy the software and work backwards to derive the unprotected source code. The copied software was then destroyed. In each case, this was held to be fair use since it was necessary to temporarily copy the software to obtain the non-protected material. There may be a difference with this case, however; at least TM claims so. It asserts in its points and authorities that taking the temporary copy in this case was not the only way to

obtain the unprotected information, and that TX was able to, and in actuality did purchase such information from certain third-parties. Both Sony and Sega stated that the fair use was justified because reverse engineering (including taking a temporary copy) was the only way the unprotected information could be obtained. Although this court recognizes that the holdings of Sony and Sega were limited to the specific context of "disassembling" copyrighted object code in order to access unprotected elements contained in the source code, this court believes that the "fair use" doctrine can be applied to the current facts.

Taking the temporary copy of the electronic information for the limited purpose of extracting unprotected public facts leads to the conclusion that the temporary use of the electronic signals was "fair use" and not actionable. In determining whether a challenged use of copyrighted material is fair, a court must keep in mind the public policy underlying the Copyright Act: to secure a fair return for an author's creative labor and to stimulate artistic creativity for the general good. This court sees no public policy that would be served by restricting TX from using spiders to temporarily download TM's event pages in order to acquire the unprotected, publicly available factual event information. The rest of the event page information (which consisted of TM identification, logos, ads, and other information) was discarded and not used by TX and is not exposed to the public by TX. In temporarily downloading TM's event pages to its RAM through the use of spiders, TX was not exploiting TM'S creative labors in any way: its spiders gathered copyrightable and non-copyrightable information alike but then immediately discarded the copyrighted material. It is unlikely that the spiders could have been programmed to take only the factual information from the TM web pages without initially downloading the entire page.

Consideration of the fair use factors listed in 17 USC § 106 supports this result. First, TX operates its site for commercial purposes, and this fact tends to weigh against a finding of fair use. Campbell v. Acuff-Rose Music ('94), 510 U.S. 569 at 585, 127 L. Ed. 2d 500 at 519, 114 S. Ct. 1164. TX's use of the data gathered from TM's event pages was only slightly transformative. As for the second factor, the nature of the copyrighted work, the copying that occurred when spiders download the event page, access the source code for each page, and extract the factual data embedded in the code, is analogous to the process of copying that the Sony court condoned (however, the Court recognizes that the fair use holding from that decision does not fit perfectly onto the facts at hand). Third, because TX's final product-the TX web site-did not contain any infringing material, the "amount and substantiality of the portion used" is of little weight. Connectix (9Cir'00) 203F3d at 606 (quoting Sega(9Cir'93) 977 F2d at 1526-1537). The fourth factor (the effect on the market value of the copyrighted work) is, of course nil, and weighs towards finding fair use. TM's arguments and evidence regarding loss of advertising revenue, as well as the loss of potential business with Volt Delta, are not persuasive.

The second copyright problem is whether the URLs (Uniform Resource Locator) are subject to copyright protection. The URLs are copied by TX and, while TX was deep hyper-linking to TM interior web pages, were used by TX to allow the deep-linking (by providing the electronic address of the particular relevant TM interior web page). This electronic address is kept in TX's computer (not provided to the customer) but was used to connect the customer to the TM interior web page when the customer pushed the button to be transferred to the web page of the broker who sells the tickets. In fact, anyone who uses the TM interior web page-TM customer or not--uses the URL to get there, although sometimes through another computer which also has the URL. TM contends that, although the URLs are strictly functional, they are entitled to copyright protection because there are several ways to write

the URL, and, thus, original authorship is used. The court disagrees. A URL is simply an address, open to the public, like the street address of a building, which, if known, can enable the user to reach the building. There is nothing sufficiently original to make the URL a copyrightable item, especially the way it is used. Feist Publications ('91), 499 U.S. 340, 113 L. Ed. 2d 358 at 369, 111 S. Ct. 1282. There appear to be no cases holding the URLs to be subject to copyright. On principle, they should not be.

The third copyright problem is whether TX's deep linking caused the unauthorized public display of TM event pages in violation of TM's exclusive rights of reproduction and display under 17 U.S.C. § 106. The Ninth Circuit in Kelly v. Arriba Soft Corp. (9Cir'02) 280 F3d 934, recognized that inline linking and framing of full-sized images of plaintiff's copyrighted photographs within the defendant's web site violated the plaintiff's public display rights. In that case, defendant's web site contained links to plaintiff's photographs (which were on plaintiff's publicly available website). Users were able to view plaintiff's photographs within the context of defendant's site: Plaintiff's images were "framed" by the defendant's window, and were thus surrounded by defendant web page's text and advertising. In one short paragraph in a declaration offered on the preliminary injunction motion, TM alleges that when a user was deep-linked from the TX site to a TM event page, a smaller window was opened. The smaller window was described as containing a page from the TM web site which was "framed" by the larger window. At the time of the preliminary injunction motion, TX stated that whether "framing" occurs or not depends on the settings on the user's computer, over which TX has no control. Thus, framing occurred on some occasions but not on others. However, TX says that it "did not try to disguise a sale by use of frames occurring on the Tickets.com website." (Reply, p. 10) TX further states that when users were linked to TM web pages, the TM event pages were clearly identified as belonging to TM.

However, even if the TM interior web site page was "framed" within the TX web page, this case is distinguishable from Kelly. In Kelly, the defendant's site would display a variety of "thumbnail" images as a result of the user's search. By clicking on the desired thumbnail image, a user could view the "Images Attributes" page, which displayed the original full-size image, a description of its dimensions, a link to the originating web site, and defendant's banner and advertising. The full-size image was not technically located on defendant's web site, but was taken directly from the originating web site. However, only the image itself, and not any other part of the originating web site, was displayed on the "Images Attributes" page. The Ninth Circuit determined that by importing plaintiff's images into its own web page, and by showing them in the context of its own site, defendant infringed upon plaintiff's exclusive public display right.

In this case, a user on the TX site was taken directly to the originating TM site, containing all the elements of that particular TM event page. Each TM event page clearly identified itself as belonging to TM. Moreover, the link on the TX site to the TM event page contained the following notice: "Buy this ticket from another online ticketing company. Click here to buy

tickets. These tickets are sold by another ticketing company. Although we can't sell them to you, the link above will take you directly to the other company's web site where you can purchase them." (2d Am. Compl. Ex.I) (emphasis in original) Even if the TM site may have been displayed as a smaller window that was literally "framed" by the larger TX window, it is not clear that, as matter of law, the linking to TX event pages would constitute a showing or public display in violation of 17 U.S.C. § 106(5). Accordingly, summary judgment is granted on the copyright claims of TM and it is eliminated from this action.

(Slip Opinion)        OCTOBER TERM, 2005                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BUCKEYE CHECK CASHING, INC. *v.* CARDEGNA ET AL.

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 04–1264.   Argued November 29, 2005—Decided February 21, 2006

For each deferred-payment transaction respondents entered into with
   Buckeye Check Cashing, they signed an Agreement containing provi-
   sions that required binding arbitration to resolve disputes arising out
   of the Agreement.  Respondents sued in Florida state court, alleging
   that Buckeye charged usurious interest rates and that the Agreement
   violated various Florida laws, rendering it criminal on its face.  The
   trial court denied Buckeye's motion to compel arbitration, holding
   that a court rather than an arbitrator should resolve a claim that a
   contract is illegal and void *ab initio*.  A state appellate court reversed,
   but was in turn reversed by the Florida Supreme Court, which rea-
   soned that enforcing an arbitration agreement in a contract chal-
   lenged as unlawful would violate state public policy and contract law.

*Held:* Regardless of whether it is brought in federal or state court, a
   challenge to the validity of a contract as a whole, and not specifically
   to the arbitration clause within it, must go to the arbitrator, not the
   court.  *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.,* 388 U. S. 395,
   and *Southland Corp.* v. *Keating,* 465 U. S. 1, answer the question
   presented here by establishing three propositions.  First, as a matter
   of substantive federal arbitration law, an arbitration provision is sev-
   erable from the remainder of the contract.  See *Prima Paint,* 388
   U. S., at 400, 402–404.  Second, unless the challenge is to the arbitra-
   tion clause itself, the issue of the contract's validity is considered by
   the arbitrator in the first instance.  See *id.,* at 403–404.  Third, this
   arbitration law applies in state as well as federal courts.  See *South-
   land, supra,* at 12.  The crux of respondents' claim is that the Agree-
   ment as a whole (including its arbitration provision) is rendered inva-
   lid by the usurious finance charge.  Because this challenges the



2        BUCKEYE CHECK CASHING, INC. *v.* CARDEGNA

Syllabus

Agreement, and not specifically its arbitration provisions, the latter are enforceable apart from the remainder of the contract, and the challenge should be considered by an arbitrator, not a court. The Florida Supreme Court erred in declining to apply *Prima Paint's* severability rule, and respondents' assertion that that rule does not apply in state court runs contrary to *Prima Paint* and *Southland.* Pp. 3–8.

894 So. 2d 860, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion. ALITO, J., took no part in the consideration or decision of the case.

Cite as: 546 U. S. ____ (2006)      1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–1264

## BUCKEYE CHECK CASHING, INC., PETITIONER *v.* JOHN CARDEGNA ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[February 21, 2006]

JUSTICE SCALIA delivered the opinion of the Court.

We decide whether a court or an arbitrator should consider the claim that a contract containing an arbitration provision is void for illegality.

I

Respondents John Cardegna and Donna Reuter entered into various deferred-payment transactions with petitioner Buckeye Check Cashing (Buckeye), in which they received cash in exchange for a personal check in the amount of the cash plus a finance charge. For each separate transaction they signed a "Deferred Deposit and Disclosure Agreement" (Agreement), which included the following arbitration provisions:

"1. *Arbitration Disclosure* By signing this Agreement, you agree that i[f] a dispute of any kind arises out of this Agreement or your application therefore or any instrument relating thereto, th[e]n either you or we or third-parties involved can choose to have that dispute resolved by binding arbitration as set forth in Paragraph 2 below . . . .

2          BUCKEYE CHECK CASHING, INC. *v.* CARDEGNA

Opinion of the Court

2. *Arbitration Provisions* Any claim, dispute, or con-
troversy . . . arising from or relating to this Agreement
. . . or the validity, enforceability, or scope of this Arbi-
tration Provision or the entire Agreement (collectively
'Claim'), shall be resolved, upon the election of you or
us or said third-parties, by binding arbitration . . . .
This arbitration Agreement is made pursuant to a
transaction involving interstate commerce, and shall
be governed by the Federal Arbitration Act ('FAA'), 9
U. S. C. Sections 1–16. The arbitrator shall apply ap-
plicable substantive law constraint *[sic]* with the FAA
and applicable statu[t]es of limitations and shall
honor claims of privilege recognized by law . . . ."

Respondents brought this putative class action in Flor-
ida state court, alleging that Buckeye charged usurious
interest rates and that the Agreement violated various
Florida lending and consumer-protection laws, rendering
it criminal on its face. Buckeye moved to compel arbitra-
tion. The trial court denied the motion, holding that a
court rather than an arbitrator should resolve a claim that
a contract is illegal and void *ab initio.* The District Court
of Appeal of Florida for the Fourth District reversed,
holding that because respondents did not challenge the
arbitration provision itself, but instead claimed that the
entire contract was void, the agreement to arbitrate was
enforceable, and the question of the contract's legality
should go to the arbitrator.

Respondents appealed, and the Florida Supreme Court
reversed, reasoning that to enforce an agreement to arbi-
trate in a contract challenged as unlawful "'could breathe
life into a contract that not only violates state law, but
also is criminal in nature . . . .'" 894 So. 2d 860, 862
(2005) (quoting *Party Yards, Inc.* v. *Templeton,* 751 So. 2d
121, 123 (Fla. App. 2000)). We granted certiorari. 545
U. S. ___ (2005).

Cite as: 546 U. S. ____ (2006)          3

Opinion of the Court

## II

### A

To overcome judicial resistance to arbitration, Congress enacted the Federal Arbitration Act (FAA), 9 U. S. C. §§1–16.  Section 2 embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts:

> "A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Challenges to the validity of arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract" can be divided into two types.  One type challenges specifically the validity of the agreement to arbitrate.  See, *e.g., Southland Corp.* v. *Keating,* 465 U. S. 1, 4–5 (1984) (challenging the agreement to arbitrate as void under California law insofar as it purported to cover claims brought under the state Franchise Investment Law).  The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.[1]  Respondents'

_____

[1]The issue of the contract's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded.  Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, *Chastain* v. *Robinson-Humphrey Co.,* 957 F. 2d 851 (CA11 1992), whether the signor lacked authority to commit the alleged principal, *Sandvik AB* v.

Opinion of the Court

claim is of this second type. The crux of the complaint is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge.

In *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967), we addressed the question of who—court or arbitrator—decides these two types of challenges. The issue in the case was "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." *Id.*, at 402. Guided by §4 of the FAA,[2] we held that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id.*, at 403–404 (internal quotation marks and footnote omitted). We rejected the view that the question of "severability" was one of state law, so that if state law held the arbitration provision not to be severable a challenge to the contract as a whole would be decided by the court. See *id.*, at 400, 402–403.

Subsequently, in *Southland Corp.*, we held that the FAA

───────────

*Advent Int'l Corp.*, 220 F. 3d 99 (CA3 2000); *Sphere Drake Ins. Ltd.* v. *All American Ins. Co.*, 256 F. 3d 587 (CA7 2001), and whether the signor lacked the mental capacity to assent, *Spahr* v. *Secco*, 330 F. 3d 1266 (CA10 2003).

[2] In pertinent part, §4 reads:

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court [with jurisdiction] . . . for an order directing that such arbitration proceed in a manner provided for in such agreement . . . . [U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . ."

Cite as: 546 U. S. ____ (2006)          5

Opinion of the Court

"create[d] a body of federal substantive law," which was "applicable in state and federal court." 465 U. S., at 12 (internal quotation marks omitted). We rejected the view that state law could bar enforcement of §2, even in the context of state-law claims brought in state court. See *id.*, at 10–14; see also *Allied-Bruce Terminix Cos.* v. *Dobson,* 513 U. S. 265, 270–273 (1995).

### B

*Prima Paint* and *Southland* answer the question presented here by establishing three propositions. First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts. The parties have not requested, and we do not undertake, reconsideration of those holdings. Applying them to this case, we conclude that because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court.

In declining to apply *Prima Paint's* rule of severability, the Florida Supreme Court relied on the distinction between void and voidable contracts. "Florida public policy and contract law," it concluded, permit "no severable, or salvageable, parts of a contract found illegal and void under Florida law." 894 So. 2d, at 864. *Prima Paint* makes this conclusion irrelevant. That case rejected application of state severability rules to the arbitration agreement *without discussing* whether the challenge at issue would have rendered the contract void or voidable. See 388 U. S., at 400–404. Indeed, the opinion expressly disclaimed any need to decide what state-law remedy was

Pg 37

Opinion of the Court

available, *id.,* at 400, n. 3, (though Justice Black's dissent *asserted* that state law rendered the contract void, *id., at* 407). Likewise in *Southland,* which arose in state court, we did not ask whether the several challenges made there—fraud, misrepresentation, breach of contract, breach of fiduciary duty, and violation of the California Franchise Investment Law—would render the contract void or voidable. We simply rejected the proposition that the enforceability of the arbitration agreement turned on the state legislature's judgment concerning the forum for enforcement of the state-law cause of action. See 465 U. S., at 10. So also here, we cannot accept the Florida Supreme Court's conclusion that enforceability of the arbitration agreement should turn on "Florida public policy and contract law," 894 So. 2d, at 864.

### C

Respondents assert that *Prima Paint's* rule of severability does not apply in state court. They argue that *Prima Paint* interpreted only §§3 and 4—two of the FAA's procedural provisions, which appear to apply by their terms only in federal court—but not §2, the only provision that we have applied in state court. This does not accurately describe *Prima Paint.* Although §4, in particular, had much to do with *Prima Paint's* understanding of the rule of severability, see 388 U. S., at 403–404, this rule ultimately arises out of §2, the FAA's substantive command that arbitration agreements be treated like all other contracts. The rule of severability establishes how this equal-footing guarantee for "a written [arbitration] provision" is to be implemented. Respondents' reading of *Prima Paint* as establishing nothing more than a federal-court rule of procedure also runs contrary to *Southland's* understanding of that case. One of the bases for *Southland's* application of §2 in state court was precisely *Prima Paint's* "reli[ance] for [its] holding on Congress' broad power to

Opinion of the Court

fashion substantive rules under the Commerce Clause." 465 U. S., at 11; see also *Prima Paint, supra,* at 407 (Black, J., dissenting) ("[t]he Court here holds that the [FAA], as a matter of *federal substantive law* . . ." (emphasis added)). *Southland* itself refused to "believe Congress intended to limit the Arbitration Act to disputes subject only to *federal*-court jurisdiction." 465 U. S., at 15.

Respondents point to the language of §2, which renders "valid, irrevocable, and enforceable" "a written provision in" or "an agreement in writing to submit to arbitration an existing controversy arising out of" a "contract." Since, respondents argue, the only arbitration agreements to which §2 applies are those involving a "contract," and since an agreement void *ab initio* under state law is not a "contract," there is no "written provision" in or "controversy arising out of" a "contract," to which §2 can apply. This argument echoes Justice Black's dissent in *Prima Paint:* "Sections 2 and 3 of the Act assume the existence of a valid contract. They merely provide for enforcement where such a valid contract exists." 388 U. S., at 412–413. We do not read "contract" so narrowly. The word appears four times in §2. Its last appearance is in the final clause, which allows a challenge to an arbitration provision "upon such grounds as exist at law or in equity for the revocation of any *contract*." (Emphasis added.) There can be no doubt that "contract" as used this last time must include contracts that later prove to be void. Otherwise, the grounds for revocation would be limited to those that rendered a contract voidable—which would mean (implausibly) that an arbitration agreement could be challenged as voidable but not as void. Because the sentence's final use of "contract" so obviously includes putative contracts, we will not read the same word earlier in the same sentence to have a more narrow meaning.[3] We note that

_____

[3]Our more natural reading is confirmed by the use of the word "con-

Pg 39

*Exhibit K*

8    BUCKEYE CHECK CASHING, INC. *v.* CARDEGNA

Opinion of the Court

neither *Prima Paint* nor *Southland* lends support to re-
spondents' reading; as we have discussed, neither case
turned on whether the challenge at issue would render the
contract voidable or void.

\*    \*    \*

It is true, as respondents assert, that the *Prima Paint*
rule permits a court to enforce an arbitration agreement in
a contract that the arbitrator later finds to be void. But it
is equally true that respondents' approach permits a court
to deny effect to an arbitration provision in a contract that
the court later finds to be perfectly enforceable. *Prima
Paint* resolved this conundrum—and resolved it in favor of
the separate enforceability of arbitration provisions. We
reaffirm today that, regardless of whether the challenge is
brought in federal or state court, a challenge to the valid-
ity of the contract as a whole, and not specifically to the
arbitration clause, must go to the arbitrator.

The judgment of the Florida Supreme Court is reversed,
and the case is remanded for further proceedings not
inconsistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or
decision of this case.

───────────

tract" elsewhere in the United States Code to refer to putative agree-
ments, regardless of whether they are legal. For instance, the Sherman
Act, 26 Stat. 209, as amended, states that "[e]very contract, combina-
tion . . . , or conspiracy in restraint of trade . . . is hereby declared to be
illegal." 15 U. S. C. §1. Under respondents' reading of "contract," a
bewildering circularity would result: A contract illegal because it was in
restraint of trade would not be a "contract" at all, and thus the statu-
tory prohibition would not apply.

Cite as: 546 U. S. \_\_\_\_ (2006)    1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 04–1264

BUCKEYE CHECK CASHING, INC., PETITIONER *v.*
JOHN CARDEGNA ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[February 21, 2006]

JUSTICE THOMAS, dissenting.

I remain of the view that the Federal Arbitration Act
(FAA), 9 U. S. C. §1 *et seq.*, does not apply to proceedings
in state courts. See *Allied-Bruce Terminix Cos.* v. *Dobson,*
513 U. S. 265, 285–297 (1995) (THOMAS, J., dissenting);
*Doctor's Associates, Inc.* v. *Casarotto,* 517 U. S. 681, 689
(1996) (same); *Green Tree Financial Corp.* v. *Bazzle,* 539
U. S. 444, 460 (2003) (same). Thus, in state-court proceed-
ings, the FAA cannot be the basis for displacing a state law
that prohibits enforcement of an arbitration clause con-
tained in a contract that is unenforceable under state law.
Accordingly, I would leave undisturbed the judgment of the
Florida Supreme Court.

Tim A. SHEA v. Pat M. RILEY, Sr.

CA 97-496___ S.W.2d ___

Court of Appeals of Arkansas
Division IV
Opinion delivered November 19, 1997

1. **Appeal & error -- review of chancery cases -- when reversed. --**
In a chancery case, the standard of review is de novo, and the
appellate court will not reverse unless the decision is clearly
against the preponderance of the evidence.

2. **Contracts -- "meeting of minds" discussed -- term no longer
favored in law. --** "Meeting of the minds" is an objective
manifestation of mutual assent for the formation of a contract;
the phrase "meeting of the minds" is disfavored; in more modern
terminology, the phrase means "objective indicators of
agreement."

3. **Contracts -- transaction never constituted binding contract --
trial court's finding affirmed. --** Where the evidence, in the
form of appellant's testimony as to his understanding of the
agreement and appellee's language in his correspondence,
supported the trial court's finding that the alleged transaction
lacked the requisite objective indicators of agreement to form a
contract, no contract between the parties ever existed; the

Pg 72

Exhibit 2

SHEA v. RILEYPage
Cite as 59 Ark. App. ___ (1997)
preponderance of the evidence.   Belue v. Belue, 38 Ark. App. 81,

828 S.W.2d 855 (1992).

Appellee quotes the trial court's remarks at the conclusion of

the hearing: "There was not a meeting of the minds as to all

critical terms of the contract."  Appellee uses this language to

argue that the parties never reached the agreement necessary to

constitute a binding contract.  From the evidence adduced at the

hearing, we agree with the substance of the chancellor's finding

but not his choice of metaphor, and therefore affirm.

"Meeting of the minds" is described as "objective manifestations

of mutual assent for the formation of a contract."  Thurman v.

Thurman, 50 Ark. App. 93, 97, 900 S.W.2d 221, 223 (1995) (citing

Dziga v. Muradian Business Brokers, Inc., 28 Ark. App. 241, 773

S.W.2d 106 (1989)).

The phrase "meeting of the minds" is disfavored.

   As Professor Farnsworth points out, "Discussions of
this topic would be improved if this much abused
metaphor ['meeting of the minds'] were abandoned.
(Citation omitted).  Although this Court used the
metaphor as late as last year, we were careful to
point out that we meant, in more modern terminology,
"objective indicator[s] of agreement."  Fort Smith
Service Fin. Corp. v. Parrish, 302 Ark. 299, 789
S.W.2d 723 (1990).

Crain Industries, Inc. v. Cass, 305 Ark. 566, 576, 810 S.W.2d

910, 916 (1991).  However, the evidence, in the form of

appellant's testimony as to his understanding of the agreement

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

### No. 01-1907

---

| | |
|---|---|
| Becton, Dickinson and Company, | * |
| | * |
| Appellee, | * |
| | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   Western District of Arkansas. |
| Accu-Path Medical Laboratory, Inc., | * |
| | *      [UNPUBLISHED] |
| Appellant. | * |

---

Submitted:  August 27, 2001
Filed:   August 27, 2001

---

Before BOWMAN, LOKEN, and HANSEN, Circuit Judges.

---

PER CURIAM.

Accu-Path Medical Laboratory, Inc. (Accu-Path) and Becton, Dickinson and Company (Becton) entered into a contract obligating Accu-Path to lease medical equipment and purchase medical supplies from Becton over a sixty-month period. Twenty-one months into the contract, Accu-Path terminated the agreement and Becton brought this diversity breach-of-contract action. Accu-Path raised the defense of mistake, arguing that it mistakenly believed the contract included a cancellation clause. Accu-Path also counterclaimed for damages on the basis of misrepresentation, namely, that Becton should have disclosed its intent to sell similar medical equipment to Accu-Path's customer because the subsequent sale eliminated Accu-Path's need for the

equipment.  The district court[1] granted summary judgment to Becton, and Accu-Path appeals.  We affirm.

Upon careful de novo review of the record, see Roeder v. Metropolitan Ins. & Annuity Co., 236 F.3d 433, 436 (8th Cir. 2001), we agree with the district court that Accu-Path's defense and counterclaim fail.  Its summary judgment submissions do not show that Becton committed any fraud in inducing Accu-Path to enter into a contract without a cancellation clause, see Union Nat'l Bank v. Farmers Bank, 786 F.2d 881, 887 (8th Cir. 1986), and Arkansas law requires fraud before rescinding or reforming a contract because of a unilateral mistake, see Westlund v. Melson, 647 S.W.2d 488, 489 (Ark. Ct. App. 1983).   Likewise, the record does not support Accu-Path's misrepresentation claim, given the lack of evidence of any special relationship of trust or confidence in this arm's-length transaction.  See Union Nat'l Bank, 786 F.2d at 887 (under Arkansas law, party has no obligation to inform unless it holds position of influence over the other).

Accordingly, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[1]The HONORABLE HARRY F. BARNES, United States District Judge for the Western District of Arkansas.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3665

_____

HealthEast Bethesda Hospital,           *
                                        *
        Plaintiff - Appellee,           *
                                        *   Appeal from the United States
        v.                              *   District Court for the
                                        *   District of Minnesota.
United Commercial Travelers of          *
America,                                *
                                        *
        Defendant - Appellant.          *

_____

Submitted: October 21, 2009
Filed: March 9, 2010

_____

Before COLLOTON, BEAM, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

In this diversity case, HealthEast Bethesda Hospital ("HealthEast") sued United Commercial Travelers of America ("UCT") for breach of an insurance settlement contract. The district court[1] granted summary judgment to HealthEast. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

_____

[1] The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I.

In June 2005, Nels J. Hansen purchased a Medicare supplement policy from UCT. That October, he was admitted to HealthEast. Before his admission, UCT informed HealthEast that Hansen was covered by its policy. HealthEast cared for Hansen until his death in April 2006.

In October, HealthEast billed UCT $331,893.40 for Hansen's care. UCT offered to settle for $265,514.72, which HealthEast accepted in November.

Days after settling, UCT obtained Hansen's health records. Reviewing them, UCT concluded that Hansen misrepresented his medical history on the insurance application. UCT rescinded the policy and refused to pay HealthEast. Months after rescinding, UCT hired an expert who determined that its maximum potential liability for Hansen's care was $134,985.44.

HealthEast sued UCT for breach of contract. Both moved for summary judgment. The district court granted summary judgment to HealthEast, ruling that the contract was not voidable because UCT bore the risk of any mistake. The district court awarded HealthEast the full settlement amount, plus interest. UCT appeals.

II.

This court reviews the district court's judgment de novo. *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 823 (8th Cir. 2009). Summary judgment is appropriate if, viewing the evidence favorably to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006).

-2-

In a diversity suit, this court applies the substantive law of the forum state, here Minnesota. *See Urban Hotel Dev. Co., Inc. v. President Dev. Group, L.C.*, 535 F.3d 874, 877 (8th Cir. 2008). This court reviews de novo the district court's interpretation of state law. *Id.*

### A.

UCT asserts it properly rescinded the settlement based on its unilateral mistake. Under Minnesota law, rescission of a contract for mistake is ordinarily founded on either mutual mistake or a "mistake by one [party] induced or contributed to by the other." *Gethsemane Lutheran Church v. Zacho*, 104 N.W.2d 645, 649 (Minn. 1960). Generally, a party cannot avoid a contract on the basis of a unilateral mistake unless there is ambiguity, fraud, or misrepresentation. *Nichols v. Shelard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980), *citing Olson v. Shepard*, 206 N.W. 711, 712-13 (Minn. 1926). Even if there is no ambiguity, fraud, or misrepresentation, relief from a unilateral mistake is available where enforcement is an "oppressive burden" and rescission would impose no substantial hardship on the other party. *Gethsemane Lutheran Church*, 104 N.W.2d at 649. A party may not, however, escape contract liability based on unilateral mistake if the party bears the risk of that mistake. *See City of Lonsdale v. NewMech Cos., Inc.*, No. 66-C7-03-001941, 2008 WL 186251, at *9-10 (Minn. Ct. App. Jan. 22, 2008), *citing* **Restatement (Second) of Contracts** § 153 (1981).

The district court denied relief to UCT, ruling that it was a sophisticated party that bore the risk of mistake and could have avoided it by investigating Hansen's policy. A party bears the risk of mistake if it is aware, at the time of contracting, that it has limited knowledge of facts to which the mistake relates, but treats that knowledge as sufficient. *NewMech Cos., Inc.*, 2008 WL 186251 at *10. A court may also allocate risk to a party where reasonable. *See id.*; *Bauer v. Am. Int'l Adjustment*

*Co.*, 389 N.W.2d 765, 768 (Minn. Ct. App. 1986) (finding that an insurance company bore the risk of internal miscommunication).

UCT contends that because HealthEast's claim was substantially larger than its rare high claims, it is not a sophisticated party in this case. This court disagrees. UCT had significant experience in handling and negotiating claims with healthcare providers. A UCT officer estimated that in 2006, the year of the HealthEast claim, UCT handled more than 495,000 claims and had premium revenue exceeding $25 million. According to the record, UCT reimbursed claims of varying amounts, including some exceeding $100,000, and has sufficient knowledge and experience to evaluate claim settlement issues. Although the HealthEast demand was atypical, the district court reasonably allocated the risk of mistake to UCT. *See Pugh v. Westreich*, No. A04-657, 2005 WL 14922, at *4 (Minn. Ct. App. Jan. 4, 2005) (analyzing insurer as a sophisticated party); *Norwest Bank Minn., N.A. v. Verex Assurance, Inc.*, No. C8-95-2292, 1996 WL 363371, at *3 (Minn. Ct. App. July 2, 1996) (allocating risk of mistake to insurer because it was in the best position to evaluate).

UCT also maintains that its inaction does not reach the degree of fault required to deny relief. *See* **Restatement (Second) of Contracts** § 157 cmt. a. The fact that a party could have avoided a mistake by reasonable care neither commands nor precludes rescission. *See id.* In this case, UCT did not exercise anything approaching ordinary care. One month elapsed between HealthEast's billing and the finalizing of the settlement agreement. During that time, UCT sought clarification only of hospital coinsurance information and lifetime reserve days. UCT did not investigate Hansen's health history despite having billing information showing Hansen's medical treatment, including that he entered HealthEast shortly after the policy became effective. UCT also failed to investigate the "exceptionally large" amount HealthEast billed. UCT did not investigate Hansen's medical records until three days *after* settling with HealthEast. Under these facts, UCT's pre-settlement inaction is an easily avoidable mistake. *See Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 752-54

-4-

*Exhibit N*

(Minn. 1985) (upholding a trial court's allocation of risk and denial of relief to mistaken parties that could have "easily" avoided the mistake before contracting); *see also Beasley v. Medin*, 479 N.W.2d 95, 98 (Minn. Ct. App. 1992) (denying rescission because adversely affected party did not conduct an investigation to discover readily available facts). Because UCT bore the risk of mistake, the district court properly denied rescission based on unilateral mistake. *See NewMech Cos., Inc.*, 2008 WL 186251 at *9-10.

## B.

UCT next asserts that the district court erred in granting summary judgment by applying principles of mutual mistake to its claim of unilateral mistake. UCT contends that an allocation-of-risk analysis is relevant only to a mutual mistake. This assertion is without merit. *See id.* (allocating risk in a claim for relief based on unilateral mistake); **Restatement (Second) of Contracts** § 153 (explaining that a mistaken party is not entitled to relief under unilateral mistake if it bore the risk of mistake).

The outcome is the same, however, under principles of mutual mistake. As with unilateral mistake, an adversely effected party may not avoid a contract based on mutual mistake if it bears the risk of the mistake. *See Winter v. Skoglund*, 404 N.W.2d 786, 793 (Minn. 1987). As discussed, UCT possessed the facts necessary to challenge the validity of the policy and the amount of the demand before settling. Nevertheless, it merely subtracted 20% from the total HealthEast demand and offered the settlement amount. UCT failed to investigate Hansen's health history until after the settlement, and did not calculate what it now claims is its maximum liability until 15 months after settling the claim. This record of inaction strongly supports the denial of relief under both unilateral and mutual mistake.

C.

On appeal, UCT also contends that the judgment is a windfall to HealthEast, because it exceeds UCT's maximum liability under its policy. UCT's lone authority, however, provides no support. In *Ferguson v. Cotler*, 382 So.2d 1315 (Fla. Dist. Ct. App. 1980), the appellate court reduced a trial court's award after finding that the parties operated under a mutual mistake. The appellate court noted that relief would be granted for a mistake so long as the mistake was not the result of a lack of due care. *Id.* at 1316. Here, to the contrary, UCT's inaction and lack of due care preclude equitable relief.

III.

The judgment of the district court is affirmed.

_____

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 08-3448

---

| | | |
|---|---|---|
| Southeastern Stud & Components, Inc., | * | |
| | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| American Eagle Design Build Studios, LLC, | * | |
| | * | |
| | * | [PUBLISHED] |
| Appellant, | * | |
| | * | |
| American Eagle Communities, LLC; Salvatore R. Carabetta; CEI Investment Corporation; Little Rock Family Housing, LLC; Shaw Infrastructure, Inc., | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

---

Submitted: June 11, 2009
Filed: December 7, 2009

---

Before BYE, HANSEN, and BENTON, Circuit Judges.

---

HANSEN, Circuit Judge.



American Eagle Design Build Studios, LLC (AEDBS) and Southeastern Stud & Components, Inc. (SES) entered into a Subcontract Work Agreement (Subcontract), which contained an arbitration clause. After a dispute arose, SES filed a lawsuit against AEDBS. Over a year after SES first filed its complaint, AEDBS filed a motion to compel arbitration. The district court[1] denied AEDBS's motion to compel arbitration, and AEDBS now appeals. For the following reasons, we affirm.

I.

AEDBS was the prime contractor constructing housing on an Air Force base in Little Rock, Arkansas. On August 23, 2006, SES and AEDBS entered into the Subcontract, which stated that SES was to provide labor and materials to the housing project. The Subcontract contained an arbitration clause that said, "[a]ny dispute between [SES] and [AEDBS] arising out of this Agreement or breach thereof, . . . may, at the option of [AEDBS], be submitted to arbitration." (J.A. at 486-87.)

A dispute arose involving payment for work performed under the Subcontract. On June 26, 2007, SES filed suit against AEDBS and several other parties. AEDBS did not move to compel arbitration at that time but, over the course of the following year, answered SES's complaint, filed responses and objections to SES's request for production of documents and filed a motion for judgment on the pleadings without raising the issue of arbitration. AEDBS claims that during this period it did not believe it could enforce the arbitration agreement under Arkansas law. On July 15, 2008, SES filed a second amended complaint. At that point, following an unpublished decision by the United States District Court for the Eastern District of Arkansas, AEDBS asserts that it believed it could enforce the arbitration agreement. In its July 29, 2008, answer to AEDBS's second amended complaint, AEDBS raised arbitration

---

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

-2-

as an affirmative defense, and on September 3, 2008, AEDBS filed a motion to compel arbitration. Before the district court, SES argued that the arbitration clause was unenforceable because: (1) there was no mutuality of obligation as the decision to enforce the arbitration clause was left entirely to AEDBS; (2) AEDBS had waived its right to arbitration by participating in the litigation; and (3) SES would be prejudiced by the arbitration.

The district court denied AEDBS's motion to compel arbitration, finding that while the arbitration clause was enforceable despite its lack of mutuality, AEDBS had waived its right to arbitration and SES would be prejudiced by the arbitration. AEDBS appeals, arguing that it did not waive its right to arbitrate the agreement by participating in the litigation.

II.

In reviewing the district court's determination that AEDBS waived its right to arbitrate the agreement, "[w]e review de novo the legal determination of waiver but examine the factual findings underlying that ruling for clear error." Lewallen v. Green Tree Servicing, L.L.C., 487 F.3d 1085, 1090 (8th Cir. 2007).

We note that there is a "'strong federal policy in favor of arbitration,'" such that "'any doubts concerning waiver of arbitrability should be resolved in favor of arbitration.'" Id. (quoting Dumont v. Saskatchewan Gov't Ins., 258 F.3d 880, 886 (8th Cir. 2001)). However, "[a] party may be found to have waived its right to arbitration if it: '(1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts.'" Id. (quoting Ritzel Commc'ns v. Mid-Am. Cellular Tel. Co., 989 F.2d 966, 969 (8th Cir. 1993)).

AEDBS asserts that, at the time SES filed its complaint against AEDBS, it did not believe that it had the right to arbitrate. According to AEDBS, before March

2008, Arkansas law required mutuality of obligation within the contract's arbitration agreement, even if there was sufficient mutuality within the rest of the contract. See Showmethemoney Check Cashers, Inc. v. Williams, 27 S.W.3d 361, 367 (Ark. 2000) ("Given the lack of mutuality to support the arbitration agreement, we hold the arbitration clause contained in the [contract] does not constitute a valid enforceable agreement to arbitrate . . . ."). AEDBS claims that it did not know it had the right to arbitrate until it discovered the March 2008 unpublished opinion, Enderlin v. XM Satellite Radio Holdings, Inc., No. 4:06-CV-0032, 2008 WL 830262 (E.D. Ark. Mar. 25, 2008) (unpublished). In Enderlin, the United States District Court for the Eastern District of Arkansas stated that "Arkansas law requiring mutuality within the arbitration paragraph itself is preempted by the [Federal Arbitration Act] because it places the arbitration clause on unequal footing with other contract terms that do not each have to be mutual." Enderlin, 2008 WL 830262, at *10. Before this, according to AEDBS, it believed the arbitration agreement was invalid because there was no mutuality of obligation. See Appellant's Br. at 18 ("[I]n the face of such adverse case authority, AEDBS did not believe (i.e. 'know') that it had a valid and enforceable right to arbitrate its dispute with SES despite the existence of the arbitration clause within its Subcontract with SES.").

However, as early as 1984 the Supreme Court held that the Federal Arbitration Act (FAA) "preempts a state law that withdraws the power to enforce arbitration agreements." Southland Corp. v. Keating, 465 U.S. 1, 16 n.10 (1984). Over a decade later, the Court again explained that "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687 (1996) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974)) (internal citations omitted). Thus, pursuant to Supreme Court precedent, it should have been clear to AEDBS that the arbitration agreement was at least arguably enforceable because Arkansas could not have

-4-

imposed additional requirements that applied only to arbitration agreements. Moreover, in 2003, five years before Enderlin, the United States District Court for the Western District of Arkansas stated that, "mutuality of obligation is not required for arbitration clauses so long as the contract as a whole is supported by consideration." Scherrey v. A.G. Edwards & Sons, Inc., No. 02-2286, 2003 U.S. Dist. LEXIS 11010, at *10 (W.D. Ark. Apr. 15, 2003) (unpublished). Thus, in spite of AEDBS's assertions, Enderlin did not make new law; it merely correctly applied existing law. In fact, Enderlin could not have changed anything as one district court is not bound by the holdings of others, even those within the same district. See, e.g., Gasperini v. Ctr. for Humanities, 518 U.S. 415, 430 n.10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom sits alone and renders decisions not binding on the others."); Jones v. Unum Life Ins. Co. of Am., 486 F. Supp. 2d 864, 867 (E.D. Ark. 2007) ("'[D]istrict court decisions are not treated as binding precedents in other cases. District court rulings have influence only to the extent that jurists in other cases find them convincing.'" (quoting IBM Credit Corp. v. United Home for Aged Hebrews, 848 F. Supp. 495 (S.D.N.Y. 1994))). As the district court correctly noted, "AEDBS was free at any time to make the same argument as the Defendant in Enderlin, but AEDBS did not." Southeastern Stud & Components, Inc. v. Am. Eagle Design Build Studios, No. 4:07CV00593, 2008 WL 4531706, at *2 (E.D. Ark. Oct. 9, 2008) (unpublished). Further, AEDBS drafted the Subcontract containing the arbitration agreement. Cf. Ritzel Commc'ns, 989 F.2d at 969 ("The Goodwin group drafted the Stock Purchase agreement that contains the arbitration provisions, and thus knew of the existing right of arbitration.").

AEDBS points to Ackerberg v. Johnson, 892 F.2d 1328 (8th Cir. 1989), in support of its argument that it did not knowingly waive its right to arbitrate because the "delay in filing a motion to compel arbitration was based on unfavorable or uncertain law." (Appellant's Br. at 22.) In Ackerberg, the defendants failed to file a motion to compel arbitration on a claim related to the Securities Act of 1933, 15

-5-

# Complaints and Other Initiating Documents
3:10-cv-03123-JLH Stebbins v. Wal-Mart Stores, Inc.

### U. S. District Court

### Western District of Arkansas

## Notice of Electronic Filing

The following transaction was entered on 12/20/2010 at 11:41 AM CST and filed on 12/20/2010

**Case Name:**            Stebbins v. Wal-Mart Stores, Inc.
**Case Number:**          3:10-cv-03123-JLH
**Filer:**                David Stebbins
**Document Number:** 5

**Docket Text:**
**AMENDED COMPLAINT as to [1] Complaint against Wal-Mart Stores, Inc., filed by David Stebbins. Related document: [1] Complaint filed by David Stebbins. (Attachments: # (1) Exhibit A - Contract, # (2) Exhibit B - Notice to companies, # (3) Exhibit C - Response, # (4) Exhibit D - Response, # (5) Exhibit E - Response, # (6) Exhibit F -Registration Confirmation, # (7) Exhibit G - Case Status, # (8) Exhibit H - USCA, MN, # (9) Exhibit I - USCA, MO, # (10) Exhibit J - Ticketmaster Corp, et al, # (11) Exhibit K - Supreme Court, # (12) Exhibit L - Re Contracts, # (13) Exhibit M - USCA, WD/AR, # (14) Exhibit N - USCA, MN, # (15) Exhibit O - USCA, ED/AR)(rw)**

**3:10-cv-03123-JLH Notice has been electronically mailed to:**

**3:10-cv-03123-JLH Notice has been delivered by other means to:**

David Stebbins
1407 N. Spring Rd.
Apt. #5
Harrison, AR 72601

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1094675213 [Date=12/20/2010] [FileNumber=585271-0